# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WILLIAM R. MCHUGH, III, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 24-1300** |
| **ST. TAMMANY PARISH, ET AL.** | **SECTION "O"** |

## ORDER AND REASONS

Before the Court are two competing motions[1] concerning application of the legislative privilege. At the core of both motions is a St. Tammany Parish Council resolution that appointed six members to the St. Tammany Parish Library Board of Control; that assigned the newly appointed members staggered terms for the stated purpose of complying with Louisiana law; and that caused the early termination of the five-year, fixed-term appointments of five former Library Board members, including Plaintiffs William R. McHugh, III, Anthony Parr, and Rebecca Taylor.[2]

For the first motion, Plaintiffs move for an *in limine* ruling that the legislative privilege does not apply.[3] They reason that the resolution is not legislation, and that the relevant acts of the St. Tammany Parish Council did not occur within the sphere of legitimate legislative activity.[4] They thus ask the Court to compel Defendants St. Tammany Parish and St. Tammany Parish Councilmember David Cougle to produce all documents that have been withheld or redacted based on the legislative privilege.[5]

---

[1] ECF Nos. 69, 70.
[2] ECF Nos. 69, 70; *see also* ECF No. 79-1.
[3] ECF No. 69.
[4] *Id.* at 1–2.
[5] *Id.* at 2.

For the second motion, Defendants—joined by seven members[6] of the St. Tammany Parish Council—move for an *in limine* ruling prohibiting Plaintiffs from breaching the legislative privilege.[7] They contend the Court should prohibit Plaintiffs from asking "about the motives for legislative enactments" during the bench trial that is set to start on Tuesday, August 13, 2024.[8] And they ask the Court to exclude three categories of evidence on legislative-privilege grounds: (1) recordings of phone calls between McHugh and members of the St. Tammany Parish Council; (2) portions of the deposition testimony of Cougle and Tanner; and (3) "any document offered into evidence that is protected from public disclosure by the legislative privilege."[9]

The motions turn on whether the legislative privilege applies. On that threshold question, the Court concludes that Defendants have not carried their burden—as proponents of the privilege—to show that the legislative privilege applies. Guided by *Bogan v. Scott–Harris*, 523 U.S. 44 (1998), *Bryan v. City of Madison*, 213 F.3d 267 (5th Cir. 2000), and *Hughes v. Tarrant County*, 948 F.2d 918 (5th Cir. 1991), and mindful that "the exercise of legislative discretion should not be inhibited by judicial interference," *Bogan*, 523 U.S. at 53, the Court concludes that Defendants have not shown that the resolution and the acts relating to it are "legislative" acts triggering application of the privilege. Accordingly, for these reasons and those that follow, Plaintiffs' motion is **GRANTED** and Defendants' motion is **DENIED**.

---

[6] Cheryl Tanner, Jeffery Corbin, Arthur Laughlin, Kathy Seiden, Patrick Burke, Larry Rolling, and Rick Smith.
[7] ECF No. 70.
[8] *Id.* at 1.
[9] Id.

2

# I.    BACKGROUND

This civil-rights case arises from Plaintiffs' claim that Defendants St. Tammany Parish and St. Tammany Parish Councilmember David Cougle violated Plaintiffs' rights under the First Amendment, the Fourteenth Amendment, and the Louisiana Constitution in connection with the issuance of a May 2, 2024 resolution (the "Resolution") terminating Plaintiffs' five-year, fixed-term appointments to the St. Tammany Parish Library Board of Control (the "Library Board") and appointing five[10] new Library Board members.[11] Among other claims, Plaintiffs assert that the St. Tammany Parish Council issued the Resolution—prematurely terminating their appointments—in retaliation for protected speech Plaintiffs made during Library Board meetings on the topic of minors' access to Lesbian, Gay, Bisexual, Transgender, and Queer ("LGBTQ") literature at St. Tammany Parish libraries.[12]

Plaintiffs William R. McHugh, III, Anthony Parr, and Rebecca Taylor allege that they are appointed members of the Library Board[13] serving five-year, fixed terms that ended on June 1, 2024. According to the complaint, six of the Library Board's seven members are appointed by the St. Tammany Parish Council, the legislative arm of St. Tammany Parish government.[14] Plaintiffs allege that the St. Tammany Parish Council appointed Plaintiff McHugh to the Library Board on June 1, 2023 for

---

[10] One of the Library Board's six Parish Council-appointed members, Ann Shaw, was reappointed via the May 2 Resolution. *See* ECF No. 13-1 at 1. Thus, the Resolution resulted in the appointment of five new Library Board members.

[11] *See generally* ECF No. 1.

[12] *See, e.g.*, *id.* at ¶ 88.

[13] *Id.* at ¶¶ 1–3.

[14] *Id.* at ¶ 5.

a five-year term expiring on August 4, 2027;[15] that the Parish Council appointed Plaintiff Parr on June 1, 2023 for a five-year term expiring on July 12, 2027;[16] and that the Parish Council appointed Plaintiff Taylor on July 7, 2022 for a five-year term expiring on July 12, 2027.[17] According to the complaint, Parr is the Library Board's "secretary/treasurer,"[18] and Taylor is the Library Board's president.[19]

Plaintiffs allege that the May 2024 termination of their appointments to the Library Board represents the culmination of "a firestorm of controversy" that began in June 2022.[20] Then, three of St. Tammany Parish's twelve library branches—the Slidell, Madisonville, and Mandeville branches—featured displays announcing "Pride Month," "an annual commemoration of primarily [LGBTQ] pride."[21] According to Plaintiffs' complaint, "one display in the children's section at the Mandeville branch library prompted complaints from patrons concerned about their children's exposure to the materials."[22] Per Plaintiffs, "a near-capacity crowd offered widespread support for the Pride displays" at a Library Board meeting in July 2022.[23]

After that July 2022 meeting, according to Plaintiffs, "[t]he controversy shifted" from Pride displays to books "featuring LGBTQ themes."[24] Plaintiffs allege that St. Tammany Parish residents formed the St. Tammany Library Accountability

---

[15] *Id.* at ¶ 1.
[16] *Id.* at ¶ 2.
[17] *Id.* at ¶ 3.
[18] *Id.* at ¶ 2.
[19] *Id.* at ¶ 3.
[20] *Id.* at ¶¶ 8–9.
[21] *Id.* at ¶ 8 (internal quotation marks and footnote omitted).
[22] *Id.* at ¶ 10.
[23] *Id.* at ¶ 13.
[24] *Id.* at ¶ 14.

Project, "an advocacy organization" with a "purported mission to prevent the sexual exploitation of children."[25] Defendant David Cougle is a co-founder of the St. Tammany Library Accountability Project.[26] Plaintiffs allege that Cougle leveraged "the issue of library materials" to win election to the St. Tammany Parish Council.[27]

According to the complaint, between summer 2022 and his election to the St. Tammany Parish Council in October 2023, Cougle repeatedly denounced the Library Board and its handling of the issue of minors' access to LGBTQ literature that Cougle and the St. Tammany Library Accountability Project deemed "sexually explicit" or "pedophilic."[28] Among other things, Plaintiffs allege that Cougle launched an online petition titled "Stop the Saint Tammany Parish Library System's Sexual Exploitation of Children!";[29] that Cougle later updated the online petition to announce his candidacy for Parish Council and to promise that, if elected, he would "do everything in [his] power to solve the library crisis[]";[30] that Cougle called the St. Tammany Parish Library System's administration "predatory"[31]; that Cougle vowed to "remove [L]ibrary [B]oard members that refused to accept community standards" if Cougle were elected to the Parish Council;[32] and that Cougle criticized what Cougle perceived to be the "liberal" and "far-left" political affiliation of the Library Board.[33]

---

[25] *Id.* at ¶ 15 (internal quotation marks omitted).
[26] *Id.* at ¶ 16.
[27] *Id.*
[28] *See, e.g.*, *id.* at ¶¶ 18, 21, 23, 31, 33 (internal quotation marks omitted).
[29] *Id.* at ¶ 28 (internal quotation marks omitted).
[30] *Id.* at ¶ 34 (internal quotation marks omitted).
[31] *Id.* at ¶ 31 (internal quotation marks omitted).
[32] *Id.* at ¶ 42 (internal quotation marks omitted).
[33] *See, e.g.*, *id.* at ¶¶ 42, 44 (internal quotation marks omitted).

According to the complaint, the current members of the St. Tammany Parish Council—including Councilman Cougle—won election in October 2023.[34] Plaintiffs allege that the October 2023 Parish Council "election swept nine new members into power," and that "only four of the current 14 Council members were previous incumbents."[35] The current Parish Council took office in January 2024.[36]

After Cougle and the other current members of the Parish Council took office, in late January 2024, Cougle allegedly wrote a position paper claiming that the Library Board appointments were "not in compliance with state law."[37] According to the complaint, Cougle contended that Section 25:214 of the Louisiana Revised Statutes requires staggered terms for Library Board appointments, and that because the appointees were not serving staggered terms, the appointments were "invalid."[38] Cougle allegedly claimed that the existing seats on the Library Board "were deemed vacant," and "urged the Parish Council to declare existing [Library Board] members' terms expired, and to nominate candidates for appointment to a staggered term[.]"[39]

According to the complaint, in February 2024, the St. Tammany Parish Library Accountability Project urged the St. Tammany Parish Council to "refrain[] from supporting" Plaintiffs, who the Project "perceived to be responsible for the current crisis."[40] A few days later, according to Plaintiffs' complaint, the St. Tammany Parish

---

[34] *Id.* at ¶ 46.
[35] *Id.*
[36] *Id.* at ¶ 49.
[37] *Id.* at ¶ 51 (internal quotation marks omitted).
[38] *Id.*
[39] *Id.* at ¶ 52.
[40] *Id.* at ¶ 56 (internal quotation marks omitted).

Library Accountability Project urged the St. Tammany Parish Council to "replac[e] the people who caused the problem," i.e., Plaintiffs.[41]

In March 2024, according to Plaintiffs, Cougle introduced a Parish Council resolution calling for nominations to fill the Library Board positions that Cougle's position paper had declared "vacant."[42] Plaintiffs allege that the Parish Council voted to postpone action on Cougle's resolution;[43] however, at a Parish Council meeting the next month, in April 2024, another Parish Council member introduced a "substantially similar" substitute resolution.[44] The substitute resolution called for (1) the appointment of six Library Board members to staggered terms that would start on June 1, 2024, and (2) Library Board nominations who would be voted on at the May 2, 2024 meeting and whose staggered terms would be assigned by randomly drawn lots.[45] Consistent with the substitute resolution, Plaintiffs allege, the Parish Council nominated 22 candidates to the Library Board, including Plaintiffs and the other then-sitting members of the Library Board, Carmen Butler and Ann Shaw.[46]

According to the complaint, on May 2, 2024, the Parish Council issued the Resolution reflecting the Council's vote not to appoint Plaintiffs to the Library Board.[47] Rather than reappointing Plaintiffs, the Parish Council voted to appoint five candidates that had been endorsed as "approved conservative candidates" who "would

---

[41] *Id.* at ¶ 57 (internal quotation marks omitted).
[42] *Id.* at ¶ 58 (internal quotation marks omitted).
[43] *Id.* at ¶ 59.
[44] *Id.* at ¶ 63.
[45] *Id.* at ¶ 64.
[46] *Id.* at ¶ 65.
[47] *Id.* at ¶ 69; *see also* ECF No. 13-1 at 1–2.

protect our children" in an ad that ran in the *Slidell Independent* the week before the Parish Council meeting.[48] Besides those five candidates, one sitting Library Board member, Ann Shaw, was reappointed to the Library Board.[49] The Resolution described these staggered appointments as "necessary" "[i]n order to comply with state law," specifically "La. R.S. 25:214(B)."[50]

Eighteen days after the St. Tammany Parish Council issued the Resolution appointing Plaintiffs' replacements, on May 20, 2024, Plaintiffs brought this 42 U.S.C. § 1983 lawsuit in this Court.[51] Plaintiffs sued St. Tammany Parish and Cougle, in his official capacity as a member of the St. Tammany Parish Council.[52] In their complaint, Plaintiffs allege four causes of action (1) First Amendment retaliation;[53] (2) viewpoint discrimination under the First Amendment;[54] (3) substantive-due-process violations under the Fourteenth Amendment;[55] and (4) violations of the free-speech rights enshrined in Article I, § 7 of the Louisiana Constitution.[56] Plaintiffs seek attorney's fees and costs under 42 U.S.C. § 1988 and "declaratory relief and an injunction barring enforcement" of the Resolution.[57] Plaintiffs do not seek damages.[58]

---

[48] ECF No. 1 at ¶¶ 67, 69 (internal quotation marks omitted).
[49] ECF No. 13-1 at 1.
[50] *Id.*
[51] *See generally* ECF No. 1.
[52] *Id.* at ¶¶ 4, 7.
[53] *Id.* at ¶¶ 83–94.
[54] *Id.* at ¶¶ 95–109.
[55] *Id.* at ¶¶ 110–117.
[56] *Id.* at ¶¶ 118–123.
[57] *Id.* at 1 (unnumbered opening paragraph).
[58] *Id.* at 24 (unnumbered "wherefore" clause).

As for the First Amendment retaliation claim, Plaintiffs allege that they "engaged in protected First Amendment activities" when they "discuss[ed] Library Board actions and agenda items; discuss[ed] and vot[ed] on book challenges; discuss[ed] censorship; [and] discuss[ed] accessibility and display of items at parish libraries."[59] Plaintiffs allege that St. Tammany Parish and Cougle "engaged in adverse action [against Plaintiffs] in suggesting, discussing, and passing [the Resolution] to appoint six new Library Board members, replacing Plaintiffs and effectively terminating their duly made appointments to the Library Board."[60] And Plaintiffs allege that those "adverse actions were motivated by and taken in retaliation for Plaintiffs' speech, not for another legitimate government reason."[61]

As for the viewpoint-discrimination claim, Plaintiffs allege they "exercised their fundamental constitutional right to speak at Library Board meetings[] [by] expressing their views about Library Board actions and agenda items; by voting on book challenges; by discussing censorship; [and] by discussing accessibility and display of items at parish libraries."[62] Plaintiffs allege "Defendants discriminated against the content and viewpoint of Plaintiffs' speech by terminating their appointments to the Library Board."[63] And Plaintiffs allege "Defendants' motive in removing Plaintiffs from the Library Board was to silence a particular viewpoint."[64]

---

[59] *Id.* at ¶ 85.
[60] *Id.* at ¶ 88.
[61] *Id.* at ¶ 90.
[62] *Id.* at ¶ 99.
[63] *Id.* at ¶101.
[64] *Id.* at ¶ 102.

As for the substantive-due-process claim under the Fourteenth Amendment, Plaintiffs allege that they "have a liberty interest" in their unpaid, voluntary appointments to the Library Board that "was implicated in the Parish Council's actions to remove them."[65] Plaintiffs allege that the Parish Council terminated their appointments "based on various false charges that were publicized, i.e., that they are liberal, activist, members of a political conspiracy to sexualize children."[66] According to Plaintiffs, "Defendants failed to refute these untrue allegations, failed to protect Plaintiffs' professional standing and reputation, and failed to redress the damages caused to them by the false charges of Cougle and others."[67] Plaintiffs ultimately allege that "Defendants terminated Plaintiffs' positions . . . without providing them due process of law to refute and redress these unfounded and untrue charges."[68]

Finally, as for the fourth and final claim—a free-speech claim under Article I, § 7 of the Louisiana Constitution—Plaintiffs allege that "Defendants intentionally and willfully retaliated against Plaintiffs for exercising their freedom of speech and association by acting to terminate their appointments to the Library Board."[69]

---

[65] *Id.* at ¶ 111.
[66] *Id.* at ¶ 112.
[67] *Id.* at ¶ 115.
[68] *Id.* at ¶117.
[69] *Id.* at ¶ 121.

On the same day Plaintiffs filed this lawsuit, Plaintiffs moved for a temporary restraining order and a preliminary injunction prohibiting Defendants from enforcing the Resolution.[70] In that May 20 motion, Plaintiffs asked the Court to issue injunctive relief before June 1, when the terms of the Library Board members appointed through the St. Tammany Parish Council's May 2 Resolution would begin.[71] Plaintiffs did not submit any evidence supporting the motion for a temporary restraining order.[72]

On May 31, two days after oral argument,[73] the Court denied the motion for a temporary restraining order.[74] The Court concluded that "Plaintiffs ha[d] not carried their heavy burden to prove an unequivocal need for issuance of a temporary restraining order by June 1, 2024."[75] "Specifically," the Court concluded that "Plaintiffs ha[d] not shown a substantial threat of irreparable injury if the new Library Board members appointed on May 2 begin their terms on June 1, considering the first meeting of the new Library Board purportedly will not occur until July 22."[76] Importantly, however, the Court "emphasize[d] that its conclusion and analysis [were] based on the limited briefing and the lack of evidence before it, and that the Court's preliminary-injunction analysis could depart sharply from the necessarily abbreviated analysis offered" in the opinion denying a temporary restraining order.[77]

---

[70] ECF No. 3.
[71] ECF No. 3-1 at 20.
[72] ECF Nos. 3 (motion); 3-1 (supporting memorandum); 3-2 (proposed order).
[73] *See* ECF No. 16 (minute entry).
[74] ECF No. 17.
[75] *Id.* at 1.
[76] Id.
[77] *Id.* at 12.

Six days later, on June 5, the Court consolidated the hearing on Plaintiffs' motion for a preliminary injunction with a bench trial on the merits of the action under Federal Rule of Civil Procedure 65(a)(2).[78] The Court's minute entry and order provided the parties "clear and unambiguous notice of the [C]ourt's intent to consolidate the trial and the hearing . . . at a time which still afford[ed] the parties a full opportunity to present their respective cases." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations, quotation marks, and brackets omitted). No party submitted a timely, reasoned objection to the Court's consolidation order.

Twenty-two days after the Court consolidated the preliminary-injunction hearing with a trial on the merits under Rule 65(a)(2), on June 27, Defendants notified the Court that Defendants objected to Rule 65(a)(2) consolidation.[79] But Defendants' notice of objection did not include any facts or supporting authority; the notice of objection simply stated that Defendants "object to the consolidation of the hearing on the merits with the trial of the Plaintiffs' request for a Preliminary Injunction," without explaining the factual or legal basis for the objection.[80] The Court overruled the objection "because Defendants . . . provided no support—factual or legal—for it."[81] Defendants have not renewed that objection or elaborated upon it.

---

[78] ECF No. 18 at 2.
[79] ECF No. 40.
[80] *Id.* at 1.
[81] ECF No. 42 at 13 n.83.

Four substantive rulings followed the Court's Rule 65(a)(2) consolidation order. First, the Court denied Cougle's Rule 12(b)(6) motion to dismiss the Section 1983 claims against him.[82] The Court reasoned that Cougle was not entitled to absolute legislative immunity for the independent reasons that (1) Plaintiffs sue him in his official capacity, and (2) Plaintiffs seek declaratory and injunctive relief against him.[83] The Court also exercised its discretion to decline to dismiss the official-capacity claims against Cougle as redundant.[84] That ruling rested, in relevant part, on three facts: (1) Plaintiffs seek prospective injunctive relief against Cougle; (2) Plaintiffs allege specific wrongdoing by Cougle; and (3) it is unclear whether Cougle would be bound by an injunction against St. Tammany Parish only, given that Cougle is not a Parish employee but an independently elected member of the Parish Council.[85]

Second, the Court denied St. Tammany Parish's Rule 12(b)(6) motion to dismiss the claims against it.[86] The Court first declined to dismiss Plaintiffs' First Amendment retaliation claim based on the facial constitutionality of the Resolution and the so-called "O'Brien rule" because the well-pleaded allegations of the complaint allowed at least a plausible inference that the Resolution effectively singled Plaintiffs out for disfavored treatment, and dismissing the claim at the Rule 12 stage would have required the Court to resolve fact disputes.[87] The Court then declined to dismiss Plaintiffs' viewpoint-discrimination claim based on the Parish's argument that

---

[82] ECF No. 37.
[83] *Id.* at 14.
[84] *Id.* at 14–17.
[85] *Id.* at 16–17.
[86] ECF No. 52.
[87] *Id.* at 12–21.

Plaintiffs do not have a First Amendment right to sit on the Library Board because Plaintiffs do not claim a constitutional right to sit on the Library Board; their First Amendment viewpoint-discrimination claim instead rests on their alleged First Amendment right to speak at Library Board meetings.[88] The Court next declined to dismiss Plaintiffs' due-process claim based on the Parish's argument that such a claim required an employment relationship because the Parish failed to persuade the Court that Plaintiffs' due-process claim in fact requires an employment relationship.[89] Finally, the Court declined to dismiss Plaintiffs' free-speech claims under the Louisiana Constitution for the same reasons the Court declined to dismiss Plaintiffs' claims under the First Amendment to the United States Constitution.[90]

Third, the Court denied two expedited discovery motions—one from Plaintiffs, one from Defendants—raising the legislative privilege and other issues in connection with June 4 discovery that Plaintiffs served on Cougle in his official capacity.[91]

In the first of those motions, Plaintiffs moved *in limine* to preclude Defendants, categorically, from asserting the legislative privilege to bar discovery.[92] Plaintiffs contended that the legislative privilege does not bar discovery because the challenged actions of the St. Tammany Parish Council were "ministerial and/or administrative" rather than legislative, and because, even if the privilege could properly be invoked, the privilege must yield because this case presents exceptional circumstances.[93]

---

[88] *Id.* at 21–24.
[89] *Id.* at 24–26.
[90] *Id.* at 26.
[91] ECF No. 42.
[92] *See generally* ECF No. 25.
[93] ECF No. 25-1 at 1–7.

In the second of those expedited discovery motions, Defendants moved for a protective order relieving them of the obligation to respond to the June 4 discovery requests directed to Cougle in his official capacity.[94] As relevant here, Defendants contended that a protective order was merited because Plaintiffs' June 4 discovery requests were directed at a non-party; the requests sought irrelevant information about legislative motive; and the legislative privilege barred the discovery.[95]

As for Defendants' argument that Plaintiffs' discovery was directed at a non-party, the Court's June 28 order and reasons concluded that Defendants had not shown good cause meriting a protective order.[96] The Court concluded that Plaintiffs' discovery was properly directed at a party, David Cougle in his official capacity, because that discovery was directed to "Defendant David Cougle," and Cougle is a Defendant in his official capacity only.[97] The Court thus declined to issue a protective order on the basis of Defendants' argument that Plaintiffs' June 4 discovery was directed at a non-party.[98] The Court further ordered Defendants to "construe each of Plaintiffs' June 4 discovery requests as directed to Cougle in his official capacity and respond accordingly by no later than Monday, July 1, 2024 at 5:00 p.m."[99]

---

[94] ECF No. 30.
[95] ECF No. 30-1 at 1–25.
[96] *Id.* at 18–20.
[97] *Id.*
[98] *Id.*
[99] *Id.* at 19–20.

As for Defendants' irrelevance-of-motive argument, the Court's June 28 order and reasons concluded that Defendants failed to carry their burden to show good cause meriting issuance of a protective order.[100] The Court reasoned that the motive for Defendants' actions was relevant to Plaintiffs' First Amendment retaliation claim because retaliatory motive is an element of that claim.[101] Consequently, the Court declined to issue a protective order based on Defendants' argument that motive is irrelevant to Plaintiffs' First Amendment retaliation claim.[102] The Court further ordered that, to the extent Defendants were refusing to respond to any of Plaintiffs' June 4 discovery based on this irrelevance-of-motive argument, "Defendants must respond to the discovery by Monday, July 1, 2024 at 5:00 p.m."[103]

As for the legislative privilege, the Court's June 28 order and reasons concluded that the Court could not resolve the legislative-privilege questions raised in the dueling discovery motions on the limited record that was before it.[104] The parties failed to provide the information necessary for the Court to decide whether, and if so, to what extent, the legislative privilege applied to bar any of Plaintiffs' June 4 discovery to Cougle in his official capacity.[105] The Court thus denied Defendants' motion for a protective order on the legislative-privilege ground without prejudice to Defendants' right to timely assert the legislative privilege in a manner that allowed

---

[100] *Id.* at 20–22.
[101] *Id.*
[102] *Id.*
[103] *Id.* at 22.
[104] *Id.* at 23–28.
[105] *Id.* at 27.

both the Court and Plaintiffs to evaluate Defendants' privilege claims.[106]

In that same June 28 order and reasons, the Court directed Defendants to provide the information necessary for the Court and Plaintiffs to assess Defendants' legislative-privilege claims on a document-specific basis.[107] Defendants did so.

No party promptly moved the Court for any further relief with respect to the legislative privilege or Plaintiffs' June 4 discovery. Plaintiffs, for their part, did not promptly move the Court to compel further responses to their June 4 discovery. Nor did Plaintiffs promptly raise with the Court any challenge to any of the specific legislative-privilege claims Defendants made in response to the Court's June 28 order and reasons. Given the absence of any request for the Court's intervention in discovery, as well as the representations of counsel during the status conferences[108] that followed the Court's June 28 order and reasons, the Court understood that the parties were cooperating in discovery without significant issue, and that any discovery disputes—related to the legislative privilege or other matters—would be submitted to the Court "as soon as practicable," as the Court ordered.[109]

But the parties did not again raise the legislative privilege or any other discovery dispute with the Court until July 23. Then, Cougle moved to quash a subpoena *duces tecum* that Plaintiffs issued to him (in his individual, non-party capacity) on legislative-privilege and relevance grounds.[110] That motion to quash

---

[106] Id.
[107] *Id.* at 28.
[108] *See* ECF Nos. 45, 48, 53.
[109] ECF No. 18 at 2.
[110] ECF No. 51.

represented the first time since the Court's June 28 order and reasons that the parties asked the Court to referee any discovery dispute or resolve any question of privilege.

In the fourth and final substantive ruling, the Court denied Cougle's motion to quash Plaintiffs' subpoena *duces tecum* on legislative-privilege and relevance grounds.[111] As for the legislative privilege, the Court declined to quash the subpoena because, according to representations Plaintiffs made about the "nature of the subpoena"[112] in their briefing, the subpoena did not actually require Cougle to disclose the 10 documents over which Cougle asserted the legislative privilege.[113] Because the Court concluded that the subpoena did not call for the disclosure of any of the 10 documents over which Cougle asserted the legislative privilege, the Court did not reach the merits of Cougle's legislative-privilege claims.[114] As for relevance, the Court concluded that Cougle had not carried his burden to show that information pre-dating his January 8, 2024 appointment to the St. Tammany Parish Council was not relevant to any claim or defense in the case.[115] The upshot of the Court's ruling was that Cougle was not required to produce any of the documents over which he asserted the legislative privilege; however, Cougle was required to produce any responsive documents he had been withholding on the relevance grounds the Court rejected.[116]

---

[111] ECF No. 57.

[112] ECF No. 54 at 5–6. Specifically, Plaintiffs' brief represented that the subpoena sought "only communications and other documents made" in Cougle's individual capacity; that it did not seek "official communications"; and that Cougle "misconstrue[d] the nature of the subpoena" insofar as he interpreted it to require production of documents made in his official capacity "after he took office." *Id.*

[113] ECF No. 57 at 22–27.

[114] *Id.* at 1–30.

[115] *Id.* at 27–29.

[116] *Id.* at 30.

After the Court issued its order and reasons denying Cougle's motion to quash, on August 1, the Court held a pretrial conference in anticipation of the August 13 bench trial.[117] Going into the pretrial conference, there were no motions pending, and the Court understood that all legislative-privilege and discovery issues the parties wished to resolve pre-trial had in fact been resolved, either by Court order or agreement of the parties. During the pretrial conference, however, the parties indicated that there were ongoing discovery disputes the parties had not yet properly submitted to the Court, and that the parties wished for a further ruling on "issues surrounding the legislative privilege." The Court thus ordered "any motion raising any 'issues surrounding legislative privilege'" to be filed by noon on August 5.[118]

Competing motions *in limine* followed.[119] Now, Plaintiffs move for (1) an *in limine* ruling that the legislative privilege does not apply; and (2) an order compelling Defendants to produce all documents withheld or redacted based on the legislative privilege.[120] Defendants oppose.[121] Defendants in turn move for an *in limine* ruling (1) prohibiting Plaintiffs from asking "about the motives for legislative enactments" during the trial; and (2) excluding (a) recordings of phone calls between McHugh and members of the St. Tammany Parish Council; (b) portions of the deposition testimony of Cougle and Tanner; and (c) "any document offered into evidence that is protected from public disclosure by the legislative privilege."[122] Plaintiffs oppose.[123]

---

[117] *See* ECF No. 68.
[118] *Id.* at 1.
[119] ECF Nos. 69, 70.
[120] ECF No. 69 at 2.
[121] ECF No. 79.
[122] Id.
[123] ECF No. 80.

19

## II.   LEGAL STANDARD

"Legislative privilege is an evidentiary privilege governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence." *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 235 (5th Cir. 2023) ("*Hughes*")[124] (internal citation, alterations, and quotation marks omitted). "The legislative privilege is personal to the legislator." *Bettencourt*, 68 F.4th at 321 (citing *Gravel v. United States*, 408 U.S. 606, 616 (1972)). "[I]f a legislator brings third parties into the legislative process," however, "those third parties may invoke the privilege on that legislator's behalf for acts done at the direction of, instruction of, or for the legislator." *Id.* at 322.

"The scope of the legislative privilege is 'necessarily broad.'" *Id.* (quoting *Hughes*, 68 F.4th at 236). "State lawmakers can invoke legislative privilege to protect actions that occurred within 'the sphere of legitimate legislative activity' or within 'the regular course of the legislative process.'" *Hughes*, 68 F.4th at 235 (first quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951); then quoting *United States v. Helstoski*, 442 U.S. 477, 489 (1979)). The legislative privilege "[e]xtend[s] well beyond voting for or against a particular piece of legislation"; the privilege "covers 'all aspects of the legislative process,' including material prepared for a legislator's understanding of legislation and materials the legislator possesses related to potential legislation." *Bettencourt*, 68 F.4th at 322 (quoting *Hughes*, 68 F.4th at 235–36) (citing *Almonte v. City of Long Beach*, 478 F.3d 100, 103 (2d Cir. 2007)).

---

[124] The Fifth Circuit has "often referred" to this decision "as *Hughes* because Senator Hughes was the first-named non-party legislator appellant who was claiming legislative privilege." *La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 314 n.5 (5th Cir. 2024) ("*Bettencourt*").

The legislative privilege also "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Brewster*, 408 U.S. 501, 525 (1972); *see also, e.g.*, *Tenney*, 341 U.S. at 377 (declaring "that it [i]s not consonant with our scheme of government for a court to inquire into the motives of legislators"). "[T]his protection enables state legislators to focus on legislating 'rather than on motions practice in lawsuits.'" *League of United Latin Am. Citizens v. Abbott*, No. 21-CV-259, — F. Supp. 3d —, 2023 WL 8880313, at *2 (W.D. Tex. Dec. 21, 2023) ("*LULAC*") (quoting *Hughes*, 68 F.4th at 237).

The privilege "also extends to material provided by or to third parties involved in the legislative process." *Id.* (citing *Hughes*, 68 F.4th at 237). "As part of that process, lawmakers routinely meet with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on legislation." *Hughes*, 68 F.4th at 235–36 (internal citation, alterations, and quotation marks omitted). So, "some communications with third parties, such as private communications with advocacy groups, are protected by legislative privilege." *Id.* (internal citation, alterations, and quotation marks omitted). Among other examples, the legislative privilege "covers material prepared for a legislator's understanding of legislation, lobbying conversations encouraging a vote on pending legislation, and even materials the legislator possesses related to potential legislation[.]" *LULAC*, 2023 WL 8880313 at *2 (internal citations omitted).

"Even if a communication or document is protected by the legislative privilege, it is possible for a legislator to waive the protections of the privilege." *Id.* at *9. For example, the "legislative privilege as to certain documents is waived when the Legislator *publicly* reveals those documents." *Hughes*, 68 F.4th at 236–37 (internal alterations, citations, and quotation marks omitted; emphasis in original). That means a legislator waives the privilege with respect to privileged documents sent "to third parties *outside* the legislative process." *Id.* at 237 (emphasis in original). But a legislator does not waive the privilege by sending privileged documents to third parties the legislator has "brought . . . *into* the [legislative] process." *Id.* (emphasis in original). In short, "where the [purportedly privileged] documents have been shared with some third parties—but haven't been shared publicly—the waiver argument fails." *Id.* Instead, "the legislative privilege is waived only when legislators send privileged documents to third parties outside the legislative process." *LULAC*, 2023 WL 8880313, at *9 (internal alterations, citation, and quotation marks omitted).

Of course, the privilege "does not extend beyond the legislative process." *LULAC*, 2023 WL 8880313, at *2. So, "[t]o the extent . . . [P]laintiffs seek discovery over materials not part of the 'proposal, formulation, and passage of legislation,' that material is not protected by the privilege." *Id.* (quoting *Hughes*, 68 F.4th at 236).

Finally, "[d]etermining the applicability" of a privilege "is a highly fact-specific inquiry," and Defendants, as "the part[ies] asserting the privilege" here, "bear[] the burden of proof." *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (internal citations and quotation marks omitted).

## III.  ANALYSIS

The competing motions *in limine* require the Court to resolve a threshold question: Does the legislative privilege apply? Plaintiffs say it does not.[125] They contend that the legislative privilege does not apply because the Resolution is not "legislative."[126] They reason that the Resolution and the acts leading up to it are not "legislative" because the Resolution is specific to the terms of the six Library Board members then holding office, and the Resolution affected a small group of identifiable people.[127] Defendants insist the privilege applies.[128] They rejoin that the Resolution[129] is "legislative" because it "bears all of the traditional hallmarks of legislation."[130]

The parties have not cited, and the Court has not located, any published Fifth Circuit authority, or any Supreme Court precedent, analyzing what acts qualify as "legislative" for purposes of the *legislative privilege*. But the Supreme Court and the Fifth Circuit have provided helpful guidance on how to determine whether acts are "legislative" for purposes of *legislative immunity*. *See, e.g.*, *Bogan*, 523 U.S. at 54–56; *Bryan*, 213 F.3d at 272–74; *Hughes*, 948 F.2d at 920–21; *see also, e.g.*, *Da Vinci Inv., Ltd. P'ship v. Parker*, 622 F. App'x 367, 371–73 (5th Cir. 2015) (per curiam); *Craig v. Police Jury Grant Par.*, 265 F. App'x 185, 189–92 (5th Cir. 2008) (per curiam).

---

[125] ECF No. 69-1 at 6–8; *see also* ECF No. 25-1 at 3–7.

[126] ECF No. 69-1 at 6–8; *see also* ECF No. 25-1 at 3–7.

[127] ECF No. 69-1 at 6–8; *see also* ECF No. 25-1 at 3–7.

[128] ECF No. 79 at 1–5; *see also* ECF No. 30-1 at 4–17.

[129] In their briefing on the motions, Defendants have not argued that the legislative privilege is triggered based on any resolution other than the May 2 Resolution discussed here. *See* ECF Nos. 70, 79. Defendants did not attach to their motion or their opposition to Plaintiffs' motion *in limine* any resolution other than the May 2 Resolution. *See* ECF Nos. 70, 70-1, 70-2, 70-3, 79, 79-1. Nor have Defendants made any argument that other resolutions differ from the May 2 Resolution in any manner that is material to the legislative-versus-administrative analysis that follows.

[130] ECF No. 30-1 at 6; *see also* ECF No. 79 at 1–3.

*Hughes v. Tarrant County* articulated the "two tests" the Fifth Circuit applies "[t]o determine whether a particular activity is legislative" for purposes of legislative immunity. *Da Vinci Inv., Ltd.*, 622 F. App'x at 371. As relevant here, *Hughes v. Tarrant County* presented the question whether Texas county commissioners enjoyed legislative immunity from a 42 U.S.C. § 1983 suit brought by a Texas state district court clerk after the county commissioners denied the clerk's request to pay the attorney's fees the clerk incurred as a result of contempt proceedings. *See* 948 F.2d at 920–21. The panel answered "no" and affirmed the denial of legislative immunity on summary judgment. *See id.* at 920. The panel rejected the commissioners' argument that the refusal to compensate the clerk for his attorney's fees "was a decision regarding the allocation of county monies, and as such was a legislative function." *Id.* at 920. In holding that decision was not "legislative," the panel relied principally on "two different tests" drawn from *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984):

> The first test focuses on the nature of the facts used to reach the given decision. If the underlying facts on which the decision is based are "legislative facts," such as "generalizations concerning a policy or state of affairs," then the decision is legislative. If the facts used in the decisionmaking are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on the "particularity of the impact of the state action." If the action involves establishment of a general policy, it is legislative; if the action single[s] out specific individuals and affect[s] them differently from others, it is administrative.

*Id.* at 921 (alterations in original) (quoting *Cutting*, 724 F.2d at 261).

Applying "the guidelines suggested" by the First Circuit and other courts, the panel held that the county commissioners' challenged conduct—specifically, "the decision to refuse to compensate [the clerk] for his attorney fees incurred in the

contempt proceedings"—"was not legislative." *Id.* at 920, 921. The panel reasoned that "[e]ven though the decision concerned the allocation of county monies, it was not based on legislative facts" because it "was not based on general facts regarding any policy, but instead, it was based on specific facts of an individual situation related to the district court clerk." *Id.* "Furthermore," the panel continued, "the action did not purport to establish a general policy; it was particular to [the clerk]." *Id.* Because the panel concluded "that the challenged conduct was not legislative," the panel held "that the commissioners are not entitled to absolute legislative immunity." *Id.*

The Fifth Circuit applied *Hughes v. Tarrant County* in *Bryan*. *See* 213 F.3d at 272–74. At issue in *Bryan* was whether two aldermen and a mayor enjoyed absolute legislative immunity from a Section 1983 suit brought by a developer whose contract to buy land zoned for apartments expired after he was unable to secure a building permit from the mayor and the board of aldermen. *Id.* at 269–72. The developer's suit challenged four sets of activities: (1) the mayor's "repeated vetoes" of the developer's site and development plans; (2) the mayor's "blocking a decision" on the developer's plans at board meetings; (3) the vote by the mayor and two aldermen to apply for a rezoning of the property at issue; and (4) events at a particular board meeting, "where the mayor placed the rezoning decision back on the agenda without notifying the parties, and where she and the two aldermen voted to rezone the property notwithstanding the board's earlier vote against rezoning." *Id.* at 272. The panel held that only the fourth set of activities qualified as "legislative." *See id.* at 273–74.

The panel held that "[t]he first challenged activity, the mayor's repeated vetoes, was non-legislative." *Id.* at 273. Each veto related to "a determination" that the developer's particular "plan satisfied city zoning ordinances or building requirements." *Id.* The panel reasoned that "[s]uch a determination does not involve the determination of a policy." *Id.* (internal quotation marks omitted). "Rather than constituting a prospective rule, an overall plan, or general policy," the panel continued, the mayor's vetoes "entered the realm of enforcement with respect to approval of a specified proposed plan." *Id.* (internal quotation marks omitted). What is more, the panel explained, "the determination" underlying the vetoes "was based on specific, particular facts and affected [the developer's] development alone." *Id.*

The panel similarly held that the second challenged activity—"where the mayor delayed decisions on approval of [the developer's] plans at various board meetings"—was non-legislative. *Id.* at 274. The panel reasoned that this activity was non-legislative because "[t]he point at issue in those [board] meetings was specifically and particularly related to the [developer's] proposed development." *Id.* The mayor's "decision to delay a vote on that issue, therefore, was also specific and particular." *Id.*

The panel also held that the third challenged activity, "the vote to apply for a rezoning," was non-legislative. *Id.* Observing that "private citizens are able to" apply for a rezoning, the panel reasoned that "[t]his type of activity is more like ad hoc decisionmaking than the formulation of a policy." *Id.*

But the panel held that the fourth and final set of challenged activities—events relating to a particular board meeting—qualified as "legislative." *Id.* At that board meeting, "the mayor placed the rezoning decision back on the agenda without notifying the parties, and . . . she and the two aldermen voted to rezone the property notwithstanding the board's earlier vote against rezoning." *Id.* at 272. Although those activities "were irregular and inappropriate," the panel held that "they were still legislative in nature because they involved a rezoning provision." *Id.* at 274.

Before *Bryan* but after *Hughes v. Tarrant County*, the Supreme Court in *Bogan* provided more guidance on the activities that are "legislative" for purposes of legislative immunity. *See* 523 U.S. at 53–56. *Bogan* stemmed from a city council ordinance eliminating a city's department of health and human services. *Id.* at 46–47. The elimination of the department was part of a package to freeze the salaries of municipal employees and eliminate 135 city positions in anticipation of a reduction in state aid. *Id.* at 47. The administrator and sole employee of the department sued the mayor, the chair of the city council ordinance committee, and others under Section 1983, alleging "that the elimination of her position was motivated by racial animus and a desire to retaliate against her." *Id.* The mayor and the chair of the city council ordinance committee moved to dismiss based on legislative immunity. *Id.* at 47.

The district court denied the motion to dismiss on absolute-legislative-immunity grounds, and the case went to trial. *Id.* After a jury found the mayor and the chair of the city council ordinance committee liable on the administrator's First Amendment claim, both parties moved for judgment notwithstanding the verdict

27

based on absolute legislative immunity. *Id.* at 48. But the district court again denied their claims of absolute legislative immunity, reasoning that "the ordinance amendment passed by the city council was an individually-targeted administrative act, rather than a neutral, legislative elimination of a position which incidentally resulted in the termination of plaintiff." *Id.* (internal quotation marks omitted).

The First Circuit affirmed in relevant part. *Id.* That court reasoned that legislative immunity did not attach because "the conduct was administrative, rather than legislative, because [the mayor and the chair of the city council ordinance committee] relied on facts relating to a particular individual [*i.e.*, the administrator] in the decisionmaking calculus." *Id.* (internal citation and quotation marks omitted).

The Supreme Court reversed. *Id.* at 56. The Court held that the challenged acts of the mayor and the chair of the city council ordinance committee—specifically, "introducing, voting for, and signing an ordinance eliminating the government office held by [the administrator]"—"constituted legislative activities." *Id.* at 46, 54–56. In so holding, the Court observed that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* at 54. The Court thus framed the dispositive question as "whether, stripped of all considerations of intent and motive, [the] actions were legislative." *Id.*

The Court answered in the affirmative. In so doing, the Court first explained that the "acts of voting for an ordinance were, in form, quintessentially legislative." *Id.* at 55. The Court next reasoned that the mayor's "introduction of a budget and signing into law an ordinance also were formally legislative, even though [the mayor]

was an executive official[,]" because the mayor's actions "were integral steps in the legislative process." *Id.* (internal citations omitted). The Court then concluded it did not need to "determine whether the formally legislative character" of the challenged actions "is alone sufficient" to merit "legislative immunity, because . . . the ordinance, in substance, bore all the hallmarks of traditional legislation." *Id.* Specifically, the Court explained that the ordinance "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents"; that the ordinance "may have prospective implications that reach well beyond the particular occupant of the office"; and that "the city council, in eliminating [the department], certainly governed 'in a field where legislators traditionally have power to act.'" *Id.* at 56 (quoting *Tenney*, 341 U.S. at 379).

The Court draws on *Bogan*, *Bryan*, and *Hughes v. Tarrant County* to determine whether the Resolution and relevant acts are "legislative." The Court does so because (1) the Fifth Circuit has drawn on legislative-immunity cases when analyzing the legislative privilege;[131] (2) the parties have not argued that, or offered any reason why, the analysis of what is "legislative" differs in this legislative-privilege context; and (3) the parties have not proposed any other analytical framework.[132]

---

[131] *See, e.g.*, *Hughes*, 68 F.4th at 235–38 (relying on, *inter alia*, *Tenney*, 341 U.S. at 376, 377; *Bogan*, 523 U.S. at 52, 53; *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980)).

[132] The parties' briefing on the issue of what is "legislative" relies in large part on thoughtful but nonprecedential district-court opinions. *See, e.g.*, ECF No. 69-1 at 6 (citing *Angelicare, LLC v. St. Bernard Par.*, No. 17-CV-7360, 2018 WL 1172947, at *7 (E.D. La. Mar. 6, 2018); ECF No. 79 at 1–2 (first citing *Pratt Land & Dev., LLC v. City of Chattanooga*, No. 1:19-CV-010, 2020 WL 5240750, at *13 (E.D. Tenn. Sept. 2, 2020); and then citing *Gaalla v. Citizens Med. Ctr.*, No. CIV.A. 6-10-14, 2012 WL 2870701, at *7 (S.D. Tex. July 10, 2012) (Costa, J.)).

Applying *Bogan*, *Bryan*, and *Hughes v. Tarrant County*, the Court concludes that Defendants have not carried their burden—as proponents of the legislative privilege—to show that the Resolution is "legislative" such that the legislative privilege applies to bar Plaintiffs' discovery and to limit otherwise admissible trial and deposition testimony.

"[S]tripped of all considerations of intent and motive," *Bogan*, 523 U.S. at 54, the Resolution is not "legislative." The Resolution did not "enact[] . . . an overall plan" or "establish[] general policy." *Hughes*, 948 F.2d at 921 (quoting *Cutting*, 724 F.2d at 261). Instead, the Resolution "was based on specific facts of an individual situation related to" the Library Board alone. *Id.* Defendants cite no evidence to the contrary.

What is more, the Resolution was "particular to" the Library Board, and it affected just eleven identifiable people: the three Plaintiffs, the two non-Plaintiff former members of the Library Board whose appointments the Resolution terminated; and the six current Board members. *Id.* "The point at issue in" the Resolution "was specifically and particularly related" to those 11 people and the Library Board alone. *Bryan*, 213 F.3d at 274. Indeed, on its face, the Resolution merely "appoint[ed] six members to the Library Board of Control with staggered terms" for the stated purpose of complying with Section 25:214(B) of the Louisiana Revised Statutes.[133] It did not address any other Parish body or establish any general policy of bringing all Parish bodies into compliance with Section 25:214(B).[134]

---

[133] ECF No. 79-1.
[134] Id.

The Resolution merely applied "general rules" of Section 25:214(B) "to one specific" Parish body *Id.*; *cf. Da Vinci Inv., Ltd. P'ship*, 622 F. App'x at 372 (reasoning that the denial of a development plan was not "legislative" because it "applied general rules to one specific piece of property" (internal alterations, citation, and quotation marks omitted))). And Defendants have not shown that the Resolution "involve[d] the degree of discretion and public policy-making traditionally associated with legislative functions" rather than "merely an administrative application of existing policies." *Minton v. St. Bernard Par. Sch. Bd.*, 803 F.2d 129, 135 (5th Cir. 1986).

The Resolution is also unlike the ordinance and acts the Supreme Court considered "legislative" in *Bogan*. *See* 523 U.S. at 55–56. First and most fundamentally, the Resolution is unlike an ordinance—and unlike "legislation" generally—because it is undisputed that the Resolution does not carry "the force of law."[135] The Home Rule Charter for St. Tammany Parish distinguishes between acts of the St. Tammany Parish Council that do and do not carry "the force of law": Although "[a]n act of the council which is not to have the force of law may be enacted by resolution,"[136] an "act of the council having the force of law shall be by ordinance."[137] Accordingly, because the Resolution does not carry "the force of law," the Resolution does not have a "formally legislative character" or bear "all the hallmarks of traditional legislation," as did the ordinance in *Bogan. See id.* at 55–56.[138]

---

[135] *See* ECF No. 56 at ¶ 11 (internal quotation marks omitted).

[136] *Id.* (internal quotation marks omitted).

[137] *See* St. Tammany Parish Home Rule Charter Commission, *A Home Rule Charter for a President–Council Government for St. Tammany Parish*, Section 2-11, "Action Requiring an Ordinance."

[138] For similar reasons, the Resolution is unlike the ordinance the Fifth Circuit considered

This case is unlike *Bogan* for another reason: Defendants have not shown that the Resolution "may have prospective implications that reach well beyond the particular occupant[s] of the" Library Board positions. *Id.* at 56. On its face, the Resolution applied only to the Library Board and eleven identifiable people. It is thus unlike the ordinance in *Bogan*—the product of a "quintessentially legislative" budget cut that had been implemented as part of a broader policy package to freeze salaries and eliminate 135 positions in anticipation of a reduction in state aid. *Id.* at 47, 55.

In sum, Defendants have not shown that the Resolution and related acts are "legislative" under *Bogan*, *Bryan*, and *Hughes v. Tarrant County.* Because Defendants have not shown that the Resolution and related acts are "legislative," Defendants have not carried their burden, as proponents of that privilege, to show that the privilege applies to bar disclosure of the documents Plaintiffs seek or testimony—by deposition or a trial—bearing on the Resolution and related matters.

Even if Defendants had shown that the Resolution and related acts were "legislative," however, the legislative privilege still would not apply broadly to bar all of the at-issue discovery and testimony. Indeed, the legislative privilege has been waived as to at least some of that discovery and testimony. A legislator waives the privilege as to documents and communications the legislator "publicly reveals"—that is, documents and communications "shared with some third parties" who are "outside

---

"legislative" in *Craig. See* 265 F. App'x at 190–92. The ordinance in *Craig* "involved the allocation of parish resources, a traditional legislative activity." *Id.* at 192 (citing *Bogan*, 523 U.S. at 55–56). Here, by contrast, Defendants have not directed the Court to anything in the record that supports a conclusion that the Resolution "involved the allocation" of St. Tammany Parish "resources" or that the Resolution "implicat[ed] [St. Tammany Parish's] budgetary considerations." *Id.*

the legislative process." *Hughes,* 68 F.4th at 236–37 (internal alterations, citations, and quotation marks omitted; emphasis in original). Here, the legislative privilege has been waived as to all documents and communications that have been shared with third parties outside the legislative process. That category of course includes any documents and communications that were produced in response to a public-records requests or otherwise released to the public. But it also includes the recordings McHugh made of phone calls with Councilmember Tanner and Councilmember Corbin, because, on this record and briefing, Defendants have not shown that McHugh was within "the legislative process" at the time of those conversations. *Id.*

And even if the Resolution were legislative, the legislative privilege would not stretch quite as far as Defendants suggest. The privilege "does not extend beyond the legislative process." *LULAC*, 2023 WL 8880313, at *2. "To the extent . . . [P]laintiffs seek discovery over materials not part of the 'proposal, formulation, and passage of legislation,' that material is not protected by the privilege." *Id.* (quoting *Hughes*, 68 F.4th at 236). Even if the Resolution were "legislative," Defendants have not shown that activities relating to the process of inviting candidates to apply for the Library Board—including interviewing candidates, sending questionnaires to candidates, and nominating them—were "part of the 'proposal, formulation, and passage of'" the Resolution. *Id.* (quoting *Hughe*s, 68 F.4th at 236). As a result, such material would not be protected from disclosure by the legislative privilege, even if it applied.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion[139] to compel and motion *in limine* on the application and scope of the legislative privilege is **GRANTED**, and Defendants' motion[140] *in limine* asserting the legislative privilege is **DENIED**. Because Defendants have not shown that the Resolution and the acts related to it are "legislative" acts triggering application of the privilege, the legislative privilege does not apply to bar (a) disclosure of the documents Plaintiffs have sought in discovery; or (b) testimony—by deposition or at trial—bearing on the Resolution and related issues. Defendants must produce all documents withheld or redacted based on a legislative-privilege objection by no later than Monday, August 12, 2024 at 12:00 p.m.

New Orleans, Louisiana, this 9th day of August, 2024.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[139] ECF No. 69.
[140] ECF No. 70.